2002 ME 11

**ALC DEVELOPMENT CORP.**

v.

**Timothy J. WALKER et al.**

Supreme Judicial Court of Maine.

Argued: Dec. 5, 2001.

Decided: Jan. 18, 2002.

David M. Hirshon, Esq. (orally), Marshall J. Tinkle, Esq., Lawrence R. Clough, Esq., Tompkins, Clough, Hirson & Langer, P.A., Portland, for plaintiff.

Sally J. Daggett, Esq. (orally), Jensen Baird Gardner & Henry, David B. McConnell, Esq. (orally), Peggy L. McGehee, Esq., Perkins, Thompson, Hinckley & Keddy, P.C., Timothy H. Boulette, Esq. (orally), John C. Bannon, Esq., Barbara T. Schneider, Esq., Murray Plumb & Murray, David S. Sherman Jr., Esq. (orally), John A. Graustein, Esq., Drummond Woodsum & MacMahon, Portland, Joseph & Mary Ann Nahon, Scarborough, for defendants.

Panel: CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] ALC Development Corp. was the developer of the Coulthard Farms subdivision in Scarborough. Ultimately all of the more than fifty lots were sold, except Lot 1 which ALC retained. ALC initiated a declaratory judgment action[1] against the other lot owners in Coulthard Farms seeking a declaration that it could use Lot 1 for an access road to support development of Wiley Farms, an adjoining parcel of property. Many lot owners defended against ALC's action, and some filed counterclaims addressing various issues.

[¶ 2] ALC now appeals and lot owners, Rizzi and Biber, the Bogles and others (Bogles),[2] the Frickes, the Reynoldses and the Nahons (collectively "the lot owners") cross-appeal from the August 3, 2001, amended order of the Superior Court (Cumberland County, *Humphrey, J.*), granting a judgment: (1) in favor of the lot owners on ALC's complaint seeking a declaratory judgment that ALC's construction of a roadway on Lot 1 of the Coulthard Farms subdivision does not violate the restrictive covenant or any other restrictions in the deed; (2) in favor of ALC

on a lot owners' counterclaim that ALC's proposed use of a utility easement across Lots 5 and 6, for the benefit of Wiley Farms, is an impermissible trespass on the lot owner's property rights; (3) in favor of lot owners on a counterclaim that ALC's proposed use of a drainage easement across Lot 6 for the benefit of Wiley Farms is an impermissible use of the drainage easement; and (4) in favor of ALC on several lot owners' counterclaims alleging a violation of the Unfair Trade Practices Act, 5 M.R.S.A. §§ 205A–213 (1989 & Supp.2001), by ALC. We affirm.

## I. CASE HISTORY

[¶ 3] In 1994, ALC acquired a parcel of land in Scarborough, now known as the Coulthard Farms subdivision. ALC subsequently subdivided Coulthard Farms into fifty-seven lots and retained Lot 1 for itself. ALC made each deed in Coulthard Farms subject to certain conditions and restrictions. Among those restrictions were both a residential use restriction and a restriction regarding structures, as follows:

1. **Residential Use.** No lot shall be improved or used except for single family residential purposes, with no more than one principal residence and said principal residence shall have a minimum of 1,700 square feet of available living space as measured by the area above continuous foundation. No temporary structure or tent shall be used as a residence.

2. **Structures.** No other buildings or structures of any nature or description shall be erected or maintained on said premises, provided, however, that nothing in this paragraph shall be construed

---

1. *See* 14 M.R.S.A. §§ 5951–5963 (1980); M.R. Civ. P. 57.

2. The parties joining in the Bogle brief include the following: the Colemans, the Ed-

wardses, the Garbers, the Nileses, the Pecors, the Piences, John and Michaela Reynolds, the Stewarts, the Volks, and the Walkers.

to prevent the construction of a barn, storage shed, cabana, pergola, fence or in-ground swimming pool; however, no above ground pools shall be permitted. Any such building or structure shall be consistent in design and materials with the single family dwelling constructed on the lot.

[¶ 4] Additionally, the deeds of all Coulthard Farms lots stated that "the parcel described herein is subject to any and all easements and restrictions as noted on said recorded plan of Coulthard Farms and to utility and access easements of record." ALC also granted to a developer of an adjacent subdivision, Settlers Green Estates, a right to use the roadways and utility easements indicated on the Coulthard Farms subdivision plan.

[¶ 5] The relevant individual deeds to lot owners also reserved to ALC (Grantor) a utility easement as follows: "Grantor excerpts [sic], reserves and retains from the foregoing premises a 15–foot wide strip of land as an easement for the underground construction, laying and maintenance of sewer and utility lines, said easement being set forth on the said record plan and particularly described ...." The Coulthard Farms subdivision plan indicates a thirty-foot[3] utility easement along the boundary of several lots, including Lots 5 and 6.

[¶ 6] The subdivision plan also indicates a thirty-foot drainage easement along the rear boundary of Lots 1 through 6, turning ninety degrees and proceeding across Lots 6 and 7, then crossing Lots 40 and 39, taking another ninety degree turn and proceeding along or near the rear boundaries of Lots 38 through 30, then discharging into a resource protection reserved area of the development. The evident purpose of the drainage easement is to carry surface water originating in the development and on higher land above the development on a defined course through the development, skirting the buildable portions of the defined lots. The drainage easement, but not the utility easements, were addressed in listed restrictive covenants that were specified to "run with the land." Thus, paragraph five of the restrictive covenants stated that lot owners could not alter the natural flow of surface water across their lots, but: "[t]his provision shall not be construed to prevent the proper improvements or maintenance of drainage easements shown on said Plan."

[¶ 7] In June 1999, ALC acquired an adjacent lot of land upon which it proposes to build a subdivision to be known as the Wiley Farms subdivision. ALC submitted a development plan to the Town of Scarborough in December 1999 that included the development of an access road to Wiley Farms over Lot 1 of Coulthard Farms. One of the subsequent proposed plans for Wiley Farms included ALC's intent to use the utility easements between Lots 5 and 6 and the drainage easement traversing many lots.

[¶ 8] ALC filed a complaint which sought a declaratory judgment pursuant to 14 M.R.S.A §§ 5951–5963[4] and M.R. Civ. P.

---

3. Fifteen feet on each lot.

4. 14 M.R.S.A § 5951 (1980) provides:
   **Uniformity of interpretation: title**
   This chapter shall be so interpreted and construed as to effectuate their general purpose to make uniform the law of those states which enact them, and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees; and may be cited as the "Uniform Declaratory Judgments Act."
   14 M.R.S.A. § 5953 (1980) provides:
   **Scope**
   Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed

57,[5] that its construction of the roadway on Lot 1, servicing Wiley Farms, would not violate the restrictive covenant or any other restrictions of record. Several lot owners answered ALC's complaint, denying ALC's allegation that the proposed roadway over Lot 1 did not violate the restrictive covenant within the deeds. Several other lot owners had agreed to ALC's proposed use or were defaulted. The owners of Lots 5 and 6 counterclaimed alleging that ALC's proposed use of the drainage and utility easements, which bordered their lots, for the benefit of Wiley Farms, would constitute a trespass or wrongful invasion of, and unlawful interference with, their property rights. An Unfair Trade Practices Act counterclaim was also asserted by some of the lot owners, alleging that ALC's declaratory judgment action constituted an unfair trade practice under the Act. One lot owner counterclaimed against ALC alleging fraud and misrepresentation.

[¶ 9] Both ALC and the residents of Coulthard Farms filed motions for summary judgment. The Superior Court found in favor of ALC with respect to the utility easement, UTPA, fraud and negligent misrepresentation claims. The court found in favor of the lot owners with regard to the proposed roadway over Lot 1 and the drainage easement. ALC as well as five of the lot owners who answered ALC's complaint have appealed the Superior Court judgment.

> for. The declaration may be either affirmative or negative in form and effect. Such declarations shall have the force and effect of a final judgment or decree.
> . . . .

5. M.R. Civ. P. 57 provides:

**Declaratory Judgments**
The procedure for obtaining a declaratory judgment pursuant to 14 M.R.S.A. §§ 5951–

## II. DISCUSSION

[¶ 10] Deed construction is a question of law that we review de novo. *Bennett v. Tracy*, 1999 ME 165, ¶ 7, 740 A.2d 571, 573. In interpreting a deed, the words of the deed are given their general and ordinary meaning to see if they create an ambiguity. *Id.* ¶ 8. If the terms of the deed are unambiguous, then the language determines the parties' intent; however, if the terms are ambiguous, the court may look to extrinsic evidence for guidance. *Id.*

### A. The Proposed Roadway Over Lot 1

[¶ 11] The Superior Court determined that the intended use of the proposed roadway across Lot 1 was not to service a single-family residence, but instead to service an entire subdivision of residences. The court concluded that such a use was not a single-family residential purpose, and was, therefore, violative of the plain language of the residential use covenant in the deed.

[¶ 12] The language of the restrictive covenant contained in the deeds is unambiguous. It provides that "[n]o lot shall be improved or used except for single family residential purposes." Citing *Boehner v. Briggs*, 528 A.2d 451 (Me.1987), ALC argues that the construction of the road on Lot 1 is permissible under the language of the restrictive use covenant provided that the road services only single-family residences and not multi-family dwellings or commercial structures. *Boehner*, however,

5963 shall be in accordance with these rules, and the right to trial by jury is preserved under the circumstances and in the manner provided in Rules 38 and 39. The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate. The court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar.

involved a building restriction, not a use restriction. The restriction in *Boehner* goes to the type of dwelling, whereas the restriction within the Coulthard Farms deeds goes to the use of the lot in general. The proposed use of Wiley Farms is irrelevant to whether the roadway complies with the lot's use restriction. The use of Lot 1 for construction of a roadway to access another subdivision is inconsistent with the single-family residential use restriction that ALC imposed on all lots in the Coulthard Farms subdivision, including Lot 1.

[¶ 13] Based on the plain language of ALC's deed restrictions, we affirm the Superior Court's determination that ALC's proposed construction of a roadway would violate the restrictive covenant within the deed.

B. The Utility and Drainage Easements

■ [¶ 14] In *Anchors v. Manter,* 1998 ME 152, ¶ 10, 714 A.2d 134, 138, we stated that easements in gross are "[e]asements that are intended to be personal rights and do not profess to create a benefit in favor of any land." Conversely, appurtenant easements are "created to benefit [a] dominant tenement and therefore run with the land." *Id.* (internal citations and quotations omitted). *See also Stickney v. City of Saco,* 2001 ME 69, ¶¶ 31–32, 770 A.2d 592, 605; *O'Donovan v. McIntosh,* 1999 ME 71, ¶¶ 7, 10, 728 A.2d 681, 683–84. Whenever possible an easement should be fairly construed to be appurtenant to the land of the person for whose use the easement is created. *Stickney,* 2001 ME 69, ¶ 33, 770 A.2d at 605; *Anchors,* 1998 ME 152, ¶ 10, 714 A.2d at 138; *O'Neill v. Williams,* 527 A.2d 322, 323 (Me.1987).

1. The Utility Easement

■ [¶ 15] The Superior Court held that the utility easement was in gross, because there is no dominant tenement. As noted above, an easement in gross does not benefit any dominant tenement. In this case,

the record indicates that the utility easement was expressly reserved to ALC in the relevant deeds. It has not yet been used and appears to serve no purpose for the Coulthard Farms subdivision, but instead appears to serve as a way to transport utility services to adjacent property. Therefore, the utility easement does not benefit Coulthard Farms as the dominant tenement. The utility easement is in gross and personal to ALC.

[¶ 16] The lot owners argue that the utility easement was created to benefit Coulthard Farms by furthering the development and sale of the lots within the subdivision. In the alternative, they argue that the utility easement benefits ALC in its ownership of Lot 1. There is no evidence that the unused utility easement either benefitted or would now benefit the sale and development of Coulthard Farms. To the contrary, the utility easement was reserved to ALC, with ALC granting a right of use to the developer of an adjacent subdivision. The utility easement may be used to benefit Wiley Farms, because it was reserved and retained by ALC for its own use. Therefore, we affirm the Superior Court's ruling that ALC may exercise its use of the utility easement over Lots 5 and 6 to benefit Wiley Farms.

2. The Drainage Easement

■ [¶ 17] Easements are presumed to be appurtenant if there is a dominant tenement and there is nothing to show that the parties intended the easement to be personal. *See Anchors,* 1998 ME 152, ¶ 10, 714 A.2d at 138. Unlike the utility easement, the dominant tenement with respect to the drainage easement is Coulthard Farms. The drainage easement benefits many lots in Coulthard Farms via the swales that create a controlled pathway for surface water runoff through the development. In the absence of these swales, the lots in Coulthard Farms may become eroded or flooded with surface wa-

ters. Paragraph five of the restrictive covenant within the deeds to Coulthard Farms provides support for the view that the drainage easement benefits the Coulthard subdivision:

> 5. **Surface Water.** No owner of a lot, his agents or employees shall alter the natural course of surface water on any lot in a way which would materially alter the natural flow of such water across any other lot unless such alteration is approved by the owners of all lots affected. This provision shall not be construed to prevent the proper improvements or maintenance of drainage easements shown on said plan.

[¶ 18] The reference to the drainage easement in a restrictive covenant that is to "run with the land" and the drainage easement's important benefit to the Coulthard Farms lots confirm its status as an appurtenant easement. Accordingly, we affirm the Superior Court's determination that the drainage easement is appurtenant to Coulthard Farms and may not be used by ALC for the benefit of the Wiley Farms property.

### C. Unfair Trade Practices Act

[¶ 19] Title 5 M.R.S.A. § 207 of the UTPA states: "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." We have stated that "[w]hether an act or practice is unfair or deceptive for the purposes of section 207 of the UTPA cannot be defined precisely and must be determined by the factfinder on a case by case basis." *Binette v. Dyer Library Ass'n,* 688 A.2d 898,

906 (Me.1996). The owners of Lot 44 alleged that ALC's lawsuit was a violation of the UTPA, because it subverted the restrictions in the deed. The Lot 44 owners assert that they now own a lot that they may not have otherwise purchased and that their lot may depreciate in value if Lot 1 is used for a purpose other than a single-family residence.

[¶ 20] The Superior Court held that ALC did not violate the UTPA, 5 M.R.S.A. §§ 205–A–213, when it filed a declaratory judgment action, because the filing of this declaratory judgment action was not an unfair or deceptive act.

[¶ 21] We agree with the Superior Court that a declaratory judgment action brought to interpret a restrictive covenant is not, as a matter of law, an unfair or deceptive act as contemplated by the UTPA. A deceptive practice must be "substantial," as articulated in *Bangor Publ'g Co. v. Union Street Mkt.,* 1998 ME 37, ¶ 7, 706 A.2d 595, 596. Even assuming that the filing of a declaratory judgment action could be considered deceptive, ALC's actions in this case do not rise to the level of being substantial. The lot owners presented no specific evidence to show that ALC attempted to deceive the purchasers of the Coulthard Farms lots. Therefore, we affirm the Superior Court's determination with respect to the defendants' UTPA claim.

The entry is:

Judgment affirmed.